



JSH/TB/USAO#2010R00504

FILED
U.S. DISTRICT COURT
DISTRICT OF MARYLAND

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

2011 JAN 11 P 2:03

CLERK'S OFFICE

| | |
|---|---|
| **UNITED STATES OF AMERICA** | * **CRIMINAL NO.** MJG 11-011 |
| | * |
| **v.** | * **(Obstruction of an Agency Proceeding,** |
| | * **18 U.S.C. § 1505; Act to Prevent Pollution** |
| **DIMITRIOS GRIFAKIS** | * **from Ships, 33 U.S.C. § 1908(a);** |
| | * **Obstruction, 18 U.S.C. § 1519;** |
| **Defendant.** | * **Witness Tampering, 18 U.S.C. § 1512;** |
| | * **False Statement, 18 U.S.C. § 1001;** |
| | * **Aiding and Abetting, 18 U.S.C. § 2)** |
| | * |

*******

## INDICTMENT

### COUNT ONE
**(Obstruction of an Agency Proceeding)**

The Grand Jury hereby charges:

At all times relevant:

*Introduction*

1. Defendant DIMITRIOS GRIFAKIS was the Chief Engineer of the *M/V Capitola* ("*Capitola*"), a 40,437 ton cargo vessel. The *Capitola* carried a wide range of dry bulk cargo to and from ports throughout the world. Aboard the *Capitola,* GRIFAKIS was the senior officer who directed engine room operations. Beginning on or about March 2009 and ending on or about May 3, 2010, GRIFAKIS repeatedly ordered his subordinates to illegally pump oil-contaminated engine room waste directly into the ocean without processing it through required pollution prevention equipment, using a bypass hose and other means. GRIFAKIS falsified documents to hide these discharges from inspectors in ports visited by the *Capitola*, including inspectors in the United States.

*Legal Framework*

2. The United States is part of the International Convention for the Prevention of Pollution from Ships, which regulates the discharge of pollutants from vessels at sea and is known as the MARPOL Protocol ("MARPOL"). The objective of MARPOL is to preserve the marine environment through the complete elimination of intentional pollution by oil and other harmful substances and the minimization of accidental discharge of such substances. One hundred and sixty-nine nations are parties to MARPOL. It is embodied in agreements that the United States has ratified and it has been implemented in the United States by the Act to Prevent Pollution from Ships ("APPS"), 33 U.S.C. § 1901, *et seq.*

3. MARPOL applies to both "flag states" and "port states." "Flag states" are nations that register vessels and that certify their compliance with international laws. The *Capitola* was registered in the Republic of Malta. "Port states" are nations that vessels visit. When a vessel visits a Port State, Port State officials may inspect the vessel to assure compliance with MARPOL, other international agreements, and domestic laws. Beginning on or about May 3, 2010, the United States Coast Guard, acting on behalf of the United States as the Port State, began an inspection of the *Capitola* in Baltimore, Maryland, which included a MARPOL inspection. That proceeding continued until on or about May 10, 2010.

4. Annex I of MARPOL established international standards governing the treatment and disposal of oil residues and oily mixtures generated in the engine room and machinery spaces of oceangoing vessels. Under MARPOL Annex I, such oily wastes may only be discharged into the ocean if they do not exceed fifteen parts per million of oil in water and only after the oily wastes have been processed through required pollution prevention equipment,

including oil filtering equipment.

5. APPS implements MARPOL. All commercial vessels operating in the navigable waters of the United States, or in a port or terminal under the jurisdiction of the United States, must comply with regulations issued under APPS. APPS criminalizes any knowing violation of MARPOL, APPS itself, or the regulations that implement APPS. 33 U.S.C. § 1908(a).

6. Consistent with the requirements contained in MARPOL Annex I, APPS regulations require that certain vessels maintain a record, called an Oil Record Book or "ORB," in which the person in charge of operations involving oily wastes must record (a) any disposal of oil residue, (b) the discharge overboard of bilge water, and (c) any other disposal of bilge water. 33 C.F.R. § 151.25(d). Discharges from a ship's engine rooms and machinery spaces must be fully and accurately recorded in the Oil Record Book without delay by the person in charge of the operation involving the discharge. 33 C.F.R. § 151.25(d) and (h). The Oil Record Book also must record any emergency, accidental, or other exceptional discharges of oil or oily mixtures, including a statement of the circumstances of, and reasons for, the discharge. 33 C.F.R. § 151.25(g). The *Capitola* was in the category of vessels required to maintain an Oil Record Book. 33 C.F.R. §§ 151.09(a)(5) & 151.25(d).

7. The United States Coast Guard ("U.S. Coast Guard"), an executive branch agency within the United States Department of Homeland Security, is charged with enforcing the laws of the United States, and has legal authority to board vessels and to conduct inspections and investigations of potential violations. Through those inspections and investigations, the U.S. Coast Guard determines a vessel's compliance with MARPOL, APPS, and related regulations. 18 U.S.C. § 89(a); 33 U.S.C. §§ 1904 & 1907. Failure to comply with international standards, including MARPOL, can form the basis for orders (a) refusing a vessel's entry into a United

States port or (b) holding a vessel in port until the U.S. Coast Guard is satisfied that the vessel does not present an unreasonable threat to the marine environment. 33 C.F.R. §§ 151.07(b) and 151.25(b).

8. In conducting inspections, U.S. Coast Guard personnel rely on statements made by a vessel's crew as well as documents, including Oil Record Books and records of waste tank soundings. The U.S. Coast Guard is specifically authorized to examine a vessel's Oil Record Book to determine, among other things, whether the vessel has operable pollution prevention equipment and appropriate procedures, whether it poses any danger to United States ports and waters, and whether the vessel discharged any oil or oily mixtures in violation of MARPOL, APPS, or any other applicable federal regulation. 33 C.F.R. § 151.23(a)(3) & (c).

*The Operation of the* Capitola

9. It was part of GRIFAKIS's job on the *Capitola* to operate the main engines and other equipment to provide appropriate power to move the vessel from port to port at required speeds, using appropriate amounts of fuel. Charterers that hired the *Capitola* did so under agreements that required the vessel to achieve certain minimum speeds, while consuming a limited amount of fuel.

10. A Second Engineer, Third Engineer, Fourth Engineer, three oilers, an electrician, and a fitter reported to GRIFAKIS and were subordinate to him. Oilers are engine room laborers that assist the engineers. Fitters work with the ship's piping, weld, and fabricate needed items.

11. Over the course of a year, the normal operation of the *Capitola* generated many metric tons of oily wastes, including:

a. Oil residue, sometimes called "sludge," which is generated during the process of purifying fuel oil so that it can be used in the vessel's main engines. Changing

lubricants also generates oil residue, as does the use of oil filtering equipment to treat oily bilge water. The oil residue generated as a result of these processes was stored on board the *Capitola* in various tanks, including the "separated oil tank." Under MARPOL, oil residue may properly be disposed of either by incineration on board the vessel or by offloading it at a port through the use of an appropriate hauler, who takes the waste to a disposal facility.

b. Oily mixtures, which were created when the water that collects in the bottom of the vessel was contaminated with oil, detergents, solvents, and other wastes that leaked and/or dripped from machinery and the engines' lubrication and fuel systems. When a member of the engine room crew pumped the *Capitola's* bilges, the oily mixtures were collected and stored in a bilge tank. According to MARPOL, collected oily mixtures are only supposed to be sent ashore for disposal or processed though pollution prevention equipment on board the vessel prior to overboard discharge.

12. As a licensed Chief Engineer, GRIFAKIS was trained in and required to comply with MARPOL, including MARPOL's Oil Record Book requirements. GRIFAKIS made entries in English in the *Capitola's* Oil Record Book, using codes and language that demonstrated his knowledge of Oil Record Book requirements under MARPOL.

13. Nevertheless, GRIFAKIS repeatedly and routinely ordered engine-room crewmembers to discharge untreated waste directly into the ocean, in violation of his professional obligations as a licensed Chief Engineer and in violation of MARPOL.

14. In order to conceal the illegal discharges he ordered, GRIFAKIS made false entries into the Oil Record Book and failed to make required entries regarding the discharges he had ordered. When the vessel was at sea, GRIFAKIS usually kept and controlled the Oil Record Book in his cabin. During GRIFAKIS's tenure as Chief Engineer, no one but GRIFAKIS made

entries in the Oil Record Book.

15. On a routine and regular basis (usually at least once each day), an engine room crewmember measured the *Capitola's* waste tanks (a process known as "sounding") and recorded those soundings in a document called the Daily Sounding Record. The Daily Sounding Record therefore contained a daily record of how much waste—including sludge and other oily mixtures—was in each waste tank. When the *Capitola* was at sea, an engine room crewmember delivered the Daily Sounding Record to GRIFAKIS in his cabin on a daily basis, together with the Engine Room Log. GRIFAKIS reviewed the Daily Sounding Record book and sometimes issued orders to pump waste out of certain tanks. Because the Daily Sounding Record was an accurate record of the amount of waste in each tank, its entries contradicted certain false entries in the Oil Record Book.

**CHARGE**

16. Between on or about May 3, 2010, and on or about May 5, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

did corruptly influence, obstruct and impede, and endeavor to influence, obstruct, and impede the due and proper administration of the law under a pending proceeding by the U.S. Coast Guard in the following ways:

a. Defendant GRIFAKIS presented and caused the presentation of a false, fictitious, and fraudulent Oil Record Book to members of the U.S. Coast Guard.

b. Defendant GRIFAKIS falsely told a U.S. Coast Guard inspector that he had not ordered anyone to pump oily waste overboard, that he knew nothing about overboard discharges, and that the only way waste was disposed of from the *Capitola* was to a barge, to a

shore facility, or to the ship's incinerator, when he then well knew that he had regularly ordered the use of a bypass hose and other means to discharge oily waste and oily bilge water overboard;

c. Defendant GRIFAKIS caused the *Capitola's* Daily Sounding Record to be concealed and destroyed in order to prevent it from being reviewed by the U.S. Coast Guard;

d. Defendant GRIFAKIS falsely told members of the U.S. Coast Guard that he did not use a daily record of soundings of the Capitola's waste tanks, when he then well knew that he kept and used a Daily Sounding Record of those tanks on a daily basis when the vessel was at sea;

e. Defendant GRIFAKIS gave the U.S. Coast Guard a signed statement, handwritten in Greek, that when translated stated, "I do not keep a daily book of measurements for the tanks of F.O. Sludge, L.O. Sludge, Sep Oil Tc, Incin Waste Oil Tc, F.O. Drain Tc, L.O. Drain Tc, etc., but daily the 08:00-12:00 shift gives me a note about the above tanks, and if a transfer is needed, it is recorded in the ~~Oil Record Book~~ oil Book," when he then well knew that he kept and used a Daily Sounding Record on a daily basis when the Capitola was at sea, and that the Daily Sounding Record included soundings for the tanks described in his statement;

f. Defendant GRIFAKIS directed members of the crew of the *Capitola* to falsely tell the U.S. Coast Guard that the vessel had no Daily Sounding Record, when in truth and in fact the *Capitola's* engine room crew maintained such a record and delivered it to GRIFAKIS on a daily basis while the vessel was at sea;

g. Defendant GRIFAKIS endeavored to cause a valve to be repaired. That valve had been previously altered to allow the *Capitola's* general service pump to take suction from the ship's separated oil tank so that the contents of that tank could be discharged into the ocean through the ship's seawater service piping;

h. Defendant GRIFAKIS moved a trick sounding tube that had been stored in the ship's lower stool and had been used to deceive and attempt to deceive fuel surveyors regarding the amount of fuel in the *Capitola's* No. 1 Fuel Tank.

18 U.S.C. §§ 1505, 1515(b), and 2.

**COUNT TWO**
**(Act to Prevent Pollution from Ships)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that between on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

did knowingly fail to maintain and caused others to fail to maintain an Oil Record Book for the *Capitola* in which all disposals of oil residue and discharges overboard and disposals otherwise of oily mixtures were fully recorded. Specifically, on or about May 3 and 4, 2010, GRIFAKIS failed to maintain an accurate Oil Record Book while in the Port of Baltimore, by failing to disclose certain overboard discharges of oily waste that he had ordered. Those overboard discharges had been made using a bypass hose, called a "magic pipe," between on or about March 2009 and April 2010. The bypass hose was used to discharge oily residue and oily mixtures directly into the sea without processing them through required pollution prevention equipment. In addition, the Oil Record Book failed to disclose a discharge occuring between on or about April 2010 and May 2010, when, under orders from GRIFAKIS, a subordinate used the *Capitola's* "GS" or "general service" pump to discharge oily mixtures overboard without processing them through required pollution prevention equipment.

33 U.S.C. § 1908(a)
18 U.S.C. § 2
33 C.F.R. § 151.25

**COUNT THREE**
**(Obstruction)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that between on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely, the U.S. Coast Guard, and in relation to and in contemplation of such matter, namely, the monitoring of a vessel's compliance with MARPOL and United States laws, did knowingly alter, destroy, conceal, and cover up, a tangible object. Specifically, GRIFAKIS caused the *Capitola's* Daily Sounding Record to be altered, destroyed, concealed, and covered up, in order to prevent it from being reviewed by the U.S. Coast Guard; altered and caused the alteration of a valve that had been previously configured to allow flow from the separated oil tank; and moved a trick sounding tube from its storage location near where it had been used to deceive and attempt to deceive fuel surveyors.

18 U.S.C. §§ 1519 and 2.

**COUNT FOUR**
**(Witness Tampering)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that between on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

knowingly used intimidation and corruptly persuaded another person, and attempted to intimidate and corruptly persuade another person, with intent to hinder, delay, and prevent the communication of information relating to the commission or possible commission of a federal offense to a law enforcement officer of the United States. Specifically, GRIFAKIS directed and corruptly persuaded members of the engine department of the *Capitola* to tell inspectors from the U.S. Coast Guard that the *Capitola* did not maintain or use a daily record of waste tank soundings, when in fact the crew did maintain, and GRIFAKIS regularly and knowingly used, such a record.

18 U.S.C. §§ 1512 and 2.

**COUNT FIVE**
**(False Statement)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

in a matter within the jurisdiction of the U.S. Coast Guard, made and used a false writing, knowing the same to contain a materially false, fictitious, and fraudulent statement. Specifically, GRIFAKIS presented and caused the presentation of a false, fictitious, and fraudulent Oil Record Book to members of the U.S. Coast Guard, when he then well knew that the Oil Record Book (a) failed to record illegal, overboard discharges of oil residue and oily mixtures and (b) concealed those discharges by recording false, fictitious, and fraudulent statements about how those wastes were processed.

18 U.S.C. §§ 1001 and 2.

**COUNT SIX**
**(False Statement)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

in a matter within the jurisdiction of the U.S. Coast Guard, made and used a false writing, knowing the same to contain a materially false, fictitious, and fraudulent statement. Specifically, GRIFAKIS gave the U.S. Coast Guard a signed statement, handwritten in Greek, that when translated stated, "I do not keep a daily book of measurements for the tanks of F.O. Sludge, L.O. Sludge, Sep Oil Tc, Incin Waste Oil Tc, F.O. Drain Tc, L.O. Drain Tc, etc., but daily the 08:00-12:00 shift gives me a note about the above tanks, and if a transfer is needed, it is recorded in the ~~Oil Record Book~~ oil Book," when he then well knew that he kept and used a Daily Sounding Record on a daily basis when the Capitola was at sea, and that the Daily Sounding Record included soundings for the tanks described in his statement.

18 U.S.C. §§ 1001 and 2.

**COUNT SEVEN**
**(False Statement)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

in a matter within the jurisdiction of the U.S. Coast Guard, made a materially false, fictitious, and fraudulent statement and representation. Specifically, GRIFAKIS falsely stated to a Coast Guard official that he had not ordered anyone to pump oily waste overboard, that he knew nothing about overboard discharges, and that the only way waste was disposed of from the *Capitola* was to a barge, to a shore facility, or to the ship's incinerator, when he then well knew that he had regularly ordered the use of a bypass hose and other means to discharge oily waste and oily bilge water overboard.

18 U.S.C. §§ 1001 and 2.

**COUNT EIGHT**
**(False Statement)**

1. The allegations contained in Paragraphs 1 through 15 of Count One are incorporated here.

2. The Grand Jury further charges that on or about May 3, 2010, and on or about May 4, 2010, in the Port of Baltimore and within the District of Maryland, the Defendant,

**DIMITRIOS GRIFAKIS,**

in a matter within the jurisdiction of the U.S. Coast Guard, made a materially false, fictitious, and fraudulent statement and representation. Specifically, GRIFAKIS falsely stated to a Coast Guard official that he did not use a daily record of soundings of the *Capitola's* waste tanks, when he then well knew that he kept and used a Daily Sounding Record of those tanks on a daily basis when the vessel was at sea.

18 U.S.C. §§ 1001 and 2.

A TRUE BILL:

/S/ Rod Rosenstein
Rod J. Rosenstein
United States Attorney

/S/ Ignacia S. Moreno
Ignacia S. Moreno
Assistant Attorney General

SIGNATURE REDACTED
Foreperson

1/11/11
Date